1

2

3 **UNITED STATES DISTRICT COURT**

4 **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NO COST CONFERENCE, INC., | NO. 12-CV-1699-GPC(WVG) |
| Plaintiff, | ORDER: |
| | (1) DENYING WINDSTREAM COMMUNICATION, INC.'S, MOTION TO DISMISS COMPLAINT; |
| | [Doc. No. 8] |
| | (2) DENYING NO COST CONFERENCE, INC.'S, MOTION TO FILE DOCUMENTS UNDER SEAL |
| v. | [Doc. No. 13] |
| | (3) GRANTING IN PART AND DENYING IN PART WINDSTREAM COMMUNICATION, INC.'S, MOTION TO DISMISS FIRST AMENDED COMPLAINT; |
| | [Doc. No. 21] |
| | (4) GRANTING IN PART AND DENYING IN PART PAETEC COMMUNICATION, INC.'S, MOTION TO DISMISS FIRST AMENDED COMPLAINT; and |
| WINDSTREAM COMMUNICATIONS, INC., *et al.*, | [Doc. No. 22] |
| Defendants. | (5) GRANTING IN PART AND DENYING IN PART WINDSTREAM CORPORATION'S MOTION TO DISMISS FIRST AMENDED COMPLAINT |
| | [Doc. No. 27] |

- 1 -

Pending before the Court are four motions to dismiss, to strike, or, in the alternative, stay this action.  The sole original Defendant, Windstream Communications, Inc. ("Wind. Inc."), moves to dismiss both the Complaint and First Amended Complaint (sometimes, "FAC"), and two newly-joined defendants, PAETEC Communications, Inc. ("PAETEC"), and Windstream Corporation ("Wind. Corp."), move to dismiss the First Amended Complaint.  All Defendants move to strike the First Amended Complaint or, in the alternative, to stay this action pending resolution of a separate action in the Western District of New York.  Also pending before the Court is Plaintiff No Cost Conference, Inc.'s ("No Cost" or "Plaintiff"), motion for leave to file under seal two exhibits to the First Amended Complaint.  The Court decides the motions on the papers pursuant to Local Civil Rule 7.1.d.1.  As explained below, the Court (1) **DENIES as moot** Wind. Inc.'s motion to dismiss the Complaint, (2) **GRANTS IN PART** and **DENIES IN PART** Wind. Inc.'s motion with respect to the First Amended Complaint, (3) **GRANTS IN PART** and **DENIES IN PART** Wind. Corp.'s motion, (4) **GRANTS IN PART** and **DENIES IN PART** PAETEC's motion, and (5) **DENIES** No Cost's motion.

## I.  BACKGROUND

### A.  Factual Background[1]

No Cost is a California corporation that provides conference calling services to the public through its conferencing equipment located in California.  [FAC, Doc. No. 15 at ¶¶ 6, 14.]  To use these services, individuals, nonprofit organizations, government agencies, and businesses throughout the country can register for a long-distance telephone number and access code that provides them access to No Cost's service.  [*Id.* ¶ 14.]  Then, when multiple individuals dial the same phone number and enter the same access code, they are placed into their conference call.

---

[1] For purposes of Defendants' motions to dismiss, the Court takes the factual allegations in No Cost's First Amended Complaint as true.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).

1    [*Id.*]  In order to provide these services to the public at no additional cost, No Cost

2    enters into relationships with local telecommunications providers, referred to in

3    telecommunications parlance as "local exchange carriers" or "LECs."  [*Id.* ¶ 15.]

4         In March 2010, No Cost and PAETEC negotiated and entered into a

5    Wholesale Master Services Agreement (the "Agreement") whereby PAETEC agreed

6    to provide No Cost with certain telecommunications services.  [*Id.* ¶¶ 17, 18.]

7    Specifically, PAETEC agreed to pay No Cost commissions based on the "[a]ccess

8    compensation . . . collected . . . from the interconnecting carriers for the Access

9    Traffic."  [FAC ¶ 18.]  Access Traffic was defined to include "[t]oll calls routed

10   from various interexchange carriers to PAETEC's network and delivered to [No

11   Cost's] telecommunications system for completion."  [*Id.*]  The Agreement

12   obligated PAETEC to calculate the commission on a monthly basis.  [*Id.* ¶ 19.]

13   PAETEC also committed itself to using its "best efforts to collect all funds" from

14   the interexchange carriers, and, in the event any dispute arose, PAETEC was

15   contractually obligated to "promptly notify [No Cost] in writing, indicating carrier

16   in question [and] showing percentage of traffic."  [*Id.* ¶ 20.]  During the course of

17   contract negotiations, PAETEC, through its agent Jay Perreault, was informed that

18   No Cost was concerned about ensuring that PAETEC had a high access charge

19   collection rate.  [*Id.* ¶ 27.]  PAETEC represented to No Cost that it maintained

20   greater than 90% rate of collections on its traffic.  [*Id.* ¶ 28.]  No Cost agreed to

21   proceed with the Agreement with PAETEC based partly on this representation.  [*Id.*

22   ¶ 29.]

23        No Cost subsequently installed its conference bridge equipment in

24   PAETEC's facilities in Oakland, California.  [*Id.* ¶ 30.]  For many months, PAETEC

25   paid No Cost the commissions due on the access traffic in conformity with the terms

26   of the Agreement.  [*Id.* ¶ 31.]  Based on the terms of the Agreement, No Cost alleges

27   it understood those payments to accurately reflect commissions for the access

28   charges PAETEC "collected" on its No Cost-bound traffic.  [*Id.*]  At no time during

1  this period did PAETEC inform No Cost that its collection rates were reduced or

2  that carriers had filed any disputes with PAETEC.  [*Id.* ¶ 32.]

3       **1.     The Merger Between PAETEC and Wind. Corp.**

4       In August 2011, Wind. Corp. announced that it would acquire PAETEC

5  through a "merger."  [*Id.* ¶ 33.]  This announcement described the merger as

6  resulting in a "combined company," and that the "combination [created] a new

7  Fortune 500 company with the financial strength and scale to compete and win

8  against any other provider in the industry."  [*Id.* ¶ 34.]  In December 2011, Wind.

9  Corp. announced that it had completed the merger, claiming that the merger would

10 "enhance Windstream's capabilities" because "Windstream"[2] was "officially

11 combine[d] with PAETEC."  [*Id.*]

12      Following the merger announcement, No Cost alleges Defendants set about

13 on a course of action aimed at causing PAETEC's customers, including No Cost, to

14 believe that PAETEC had become part of Wind. Inc.  [*Id.* ¶ 35.]  For example, the

15 PAETEC employees with whom No Cost had previously communicated began

16 using Windstream email addresses, and invoices began displaying the Windstream

17 logo.  [*Id.*]  Moreover, on November 22, 2011, Wind. Corp. sent a letter to No Cost

18 advising that it had acquired PAETEC and was "moving their accounts payable

19 functions to the corporate headquarters of its subsidiary, Windstream

20 Communications, Inc."  [*Id.* ¶ 36.]  This letter also included "a list of all the entities

21 that should be changed to Windstream Communications Inc.," which specifically

22 included "PAETEC Communications, Inc."  [Ex. B to FAC.]

23      On December 1, 2011, Windstream sent a second letter to No Cost stating

24 that "PAETEC is now part of Windstream Communications."  [Ex. C to FAC.]  In

25 addition, invoices received by No Cost began to include the following statement:

26

27        [2] No Cost avers that it received ambiguous communications that did not identify whether
   "Windstream" referred to Wind. Inc. or Wind. Corp.  Consequently, No Cost at times refers to

28 Wind. Inc. and Wind. Corp. individually, but also refers to them generically as "Windstream"
   where confusion exists about which company No Cost was dealing with.

**PAETEC is Now Part of Windstream!**
As you may have heard, PAETEC is now part of Windstream Communications. You'll notice that the Windstream logo now appears on your invoice. While the logo is changing, our commitment to providing you the best products and services is exactly the same.

[Ex. D. to FAC (bold typeface in original).]  Moreover, No Cost alleges that Defendants have, since the date of the merger, operated as a single entity.  [*Id.* ¶¶ 39-42.]  As a result of the merger and the publicity surrounding it, No Cost alleges it believed that the Windstream Defendants had assumed all rights and responsibilities with regard to PAETEC, including PAETEC's obligations under the Agreement. [*Id.* ¶ 39.]

Shortly after the merger, Defendants stopped making payments to No Cost for the commissions due under the Agreement.  [*Id.* ¶ 44.]  In reliance on the new contact information given to it, No Cost contacted the Windstream Defendants to resolve the payment issues.  [*Id.* ¶ 45.]  Between February and June of 2012 No Cost communicated with the Windstream Defendants on a consistent basis regarding the payment dispute.  [*Id.* ¶¶ 45-52.]

**2.    Disclosure of the Less Than 90% Collection Rate**

On April 24, 2012, Dan Cobb, Vice President-Wholesale Sales for the generic "Windstream," provided No Cost with a spreadsheet that was described as "a reconciliation of [No Cost's] commission payments with PAETEC's collection history for 2011 traffic."  [*Id.* ¶ 49.]  Windstream claimed that the document reflected "a significant difference in the revenue that PAETEC used to calculate commissions and the actual revenue collected," and that, as a result, PAETEC had overpaid No Cost in the past by $808,769.00.  [*Id.*]

Through this spreadsheet, Windstream disclosed for the first time that it or PAETEC had a purported collection rate of as little as 55% of the access charges billed on the traffic terminating to No Cost, rather than the 90% that PAETEC had assured No Cost it was collecting.  [*Id.* ¶ 50.]  These lower collection rates, which went back to at least the time of the merger, were not previously disclosed to No

1  Cost.  [*Id.*]  Then, on May 16, 2012, Dorinda Foos, Manager, Contracts & Sales

2  Administration, Wholesale Markets for the generic Windstream, forwarded a letter

3  to No Cost providing further information about the billing disputes.  [*Id.* ¶ 51.]  Ms.

4  Foos included a spreadsheet authored by Windstream purporting to be a settlement

5  offer.  [*Id.*]

6      On June 29, 2012, Windstream provided No Cost with what it described as "a

7  different version of the reconciliation" that it had previously provided to No Cost on

8  April 24, 2012.  [*Id.* ¶ 52.]  According to this new reconciliation, Windstream

9  appeared to represent that, without any notice to No Cost, it or PAETEC had failed

10  to bill the responsible long-distance carriers for as much as 43% of the access

11  charges associated with No Cost's traffic.  [*Id.*]  On the amounts that were billed,

12  Defendants collected as little as 55% of those amounts.  [*Id.*]  Thus, according to

13  this document, Defendants' collection rate was approximately 35%, rather than the

14  90% that had been represented to No Cost during negotiations.  [*Id.*]  Pursuant to

15  this revised reconciliation, Defendants claimed to have overpaid No Cost by

16  $1,193,143.00.  [*Id.* ¶ 53.]

17  **B.    Procedural Background**

18      On July 9, 2012, No Cost filed suit in this District against a single defendant,

19  Wind. Inc., asserting claims for breach of contract, "fraud/negligent

20  misrepresentation," accounting, and declaratory judgment.  [Compl., Doc. No. 1.]

21      On August 13, 2012, PAETEC filed suit against No Cost in the United States

22  District Court for the Western District of New York.  [W.D.N.Y. Compl., Doc. No.

23  8-7.]  PAETEC's claims against No Cost were largely based on the same events and

24  transactions as the instant action, except PAETEC sought return of alleged

25  overpayment of commissions it paid to No Cost pursuant to the Agreement.  The

26  complaint in the New York action also alleged that "PAETEC's immediate parent

27  holding company, PAETEC Holding Corp., became a subsidiary of Windstream

28  Corporation, but following that transaction, PAETEC remained a separate legal

entity . . . ." [*Id.* ¶ 2.]  PAETEC claimed at least $900,000 in net damages for alleged commission overpayments made to No Cost.  [*Id.* ¶¶ 12, 15.]

On August 15, 2012, Wind. Inc. filed a motion to dismiss in the instant case partly on the basis that No Cost's contract was with PAETEC, not Wind Inc.  [Doc. No. 8.]  Wind. Inc. argued that PAETEC remained a "viable entity" after the merger and, as a result, no basis existed to sue Wind. Inc.  Further, Wind. Inc. argued that the action in this District should be dismissed based on PAETEC's suit in the Western District of New York.

On August 29, 2012, in response to the W.D.N.Y. action and Wind. Inc.'s motion to dismiss, No Cost filed a First Amended Complaint that asserted No Cost's original claims against Wind. Inc. and two new defendants, Wind. Corp. and PAETEC.  [FAC, Doc. No. 15.]  No Cost additionally asserted claims for tortious interference and "fraud/negligent misrepresentation" against "Windstream," which referred to Wind. Inc., Wind. Corp., or both.

In September 2012, Defendants filed separate motions to dismiss, strike, or stay.  All three Defendants moved the Court to strike the First Amended Complaint on the basis that Federal Rule of Civil Procedure 15(a)[3] does not permit No Cost to amend the Complaint to add Wind. Corp. and PAETEC.  Rather, they argue, No Cost must seek leave to join Wind. Corp. and PAETEC pursuant to Rule 21.  Wind. Inc. and Wind. Corp. also seek their dismissal from this case on the basis that they were not party to the Agreement.  Wind. Inc. and Wind. Corp. further seek dismissal of the "Fraud/Negligent Misrepresentation" and tortious interference claims. Finally, all three Defendants seek a stay of this action so that the New York action, which they argue is the true first-filed action, may proceed.

---

[3]  All further references to the "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

1

## II.   LEGAL STANDARD

2       A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint.

3   *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "While a complaint attacked

4   by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a

5   plaintiff's obligation to provide the grounds of [its] entitlement to relief requires

6   more than labels and conclusions, and a formulaic recitation of the elements of a

7   cause of action will not do.  Factual allegations must be enough to raise a right to

8   relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

9   (2007) (internal quotation marks, brackets and citations omitted).

10      In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume

11  the truth of all factual allegations and must construe them in the light most

12  favorable to the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336,

13  337-38 (9th Cir. 1996).  Legal conclusions need not be taken as true merely because

14  they are cast in the form of factual allegations.  *Roberts v. Corrothers*, 812 F.2d

15  1173, 1177 (9th Cir. 1987); *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.

16  1981).  Similarly, "conclusory allegations of law and unwarranted inferences are not

17  sufficient to defeat a motion to dismiss."  *Pareto v. Fed. Deposit Ins. Corp.*, 139

18  F.3d 696, 699 (9th Cir. 1998).

19      A claim has "facial plausibility when the plaintiff pleads factual content that

20  allows the court to draw the reasonable inference that the defendant is liable for the

21  misconduct alleged."  *Ashcroft. v. Iqbal*, 556 U.S. 662, 678 (2009).  "The

22  plausibility standard is not akin to a 'probability requirement,' but it asks for more

23  than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Where a

24  complaint pleads facts that are 'merely consistent with' a defendant's liability, it

25  'stops short of the line between possibility and plausibility of entitlement to relief.'"

26  *Id.* (citing *Twombly*, 550 U.S. at 557).

27

28

### III. DISCUSSION

**A.    Defendants' Requests For Judicial Notice**

As an initial matter, Defendants have filed four separate requests that the Court take judicial notice of various documents.  No Cost has not opposed any of these requests.

"Judicial notice" is a court's recognition of the existence of a fact without the necessity of formal proof.  *See Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992).  Facts proper for judicial notice are those not subject to reasonable dispute and either "generally known" in the community or "capable of accurate and ready determination" by reference to sources whose accuracy cannot be reasonably questioned.  Fed. R. Evid. 201.  For example, courts may take judicial notice of public records.  *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Cal.*, 536 F.3d 1034, 1039-40 & n.4 (9th Cir. 2008).  Judicial notice is particularly appropriate for the court's own records in prior litigation related to the case before it.  *Amphibious Partners, LLC v. Redman*, 534 F.3d 1357, 1361-62 (10th Cir. 2008) (district court was entitled to take judicial notice of its memorandum of order and judgment from previous case involving same parties); *see also United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004) (taking judicial notice of court records in another case).  Moreover, courts may take judicial notice of some public records, including the "records and reports of administrative bodies."  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003).

Here, Wind. Inc. seeks judicial notice of the Wholesale Master Services Agreement between PAETEC and No Cost, a printout from the California Secretary of State's website showing PAETEC's status as a California corporation, the complaint filed in the New York action, and the Complaint filed in the instant action.  [Doc. No. 21-4.]  The Court **GRANTS** Wind. Inc.'s motion in all respects.  The two court-filed complaints are properly subject to judicial notice as court records in the instant action and a related case.  The printout from the Secretary of

1   State's website is subject to judicial notice as a public record and as containing facts

2   the accuracy of which cannot reasonably be disputed.  Finally, the Wholesale

3   Master Services Agreement is judicially noticeable as a document which is

4   referenced by both the Complaint and First Amended Complaint and which No Cost

5   itself seeks to file as part of its First Amended Complaint.

6        Next, PAETEC and Wind. Corp. request that the Court take judicial notice of

7   the same document:  an "Application and Request for *Ex Parte* Relief" filed with

8   the California Public Utilities Commission.  [Doc. No. 22-3; Doc. No. 27-3.]  The

9   Court **GRANTS** Wind. Corp. and PAETEC's motions, as this document is a matter

10  of public record that was filed with a public administrative agency.

11       Finally, Defendants collectively ask the Court to take judicial notice of an

12  order of the United States District Court for the Western District of New York.

13  [Doc. No. 43-1.]  The Court **GRANTS** Defendants' motion, as this document is part

14  of the court record in a related action.

15  **B.     Defendants' Motions to Strike the First Amended Complaint**

16       Defendants move to strike the First Amended Complaint on the basis that No

17  Cost added PAETEC and Wind. Corp. without leave of Court in violation of Rule

18  21.  No Cost counters that its amended complaint is valid because Rule 15 grants it

19  the ability to amend the Complaint as a matter of course within twenty-one days of a

20  motion to dismiss.  Except for joining PAETEC and Wind. Corp. as parties to this

21  action, no dispute exists that No Cost had the right to otherwise amend the

22  Complaint given that No Cost filed the First Amended Complaint within twenty-one

23  days of Wind. Inc.'s first motion to dismiss.  The Court concludes that No Cost's

24  First Amended Complaint was properly amended to join PAETEC and Wind. Corp.

25       The addition of new parties is governed by Rule 21, which states, in pertinent

26  part, that "[o]n motion or on its own, the court may at any time, on just terms, add or

27  drop a party."  Accordingly, pursuant to Rule 21, new parties seemingly may only

28  be added by order of the court.  Rule 15, however, provides that "a party may amend

1   its pleading once as a matter of course" within "21 days after service of a motion

2   under Rule 12(b)."  Fed. R. Civ. P. 15(a)(1)(B).  Therefore, Rule 15 arguably

3   provides an exception to Rule 21.  Although the Ninth Circuit Court of Appeals has

4   not had occasion to address this discrete issue, other Courts of Appeals have done

5   so and have come to different conclusions.  Defendants rely on *Moore v. State of*

6   *Indiana*, 999 F.2d 1125, 1128 (7th Cir. 1993), in which the court noted:  "Although

7   Rule 15(a) generally permits the plaintiff to amend his complaint once as a matter of

8   course before a responsive pleading is served, here, the plaintiff's requested

9   amendment required leave from the court because it sought to assert claims against

10  additional defendants."

11       However, as No Cost indicates, *Moore* appears to be the minority rule, as at

12  least four other Courts of Appeals have concluded–or at least discussed in dicta–that

13  Rule 15 allows parties to be added as a matter of course.  *See, e.g.*, *Galustian v.*

14  *Peter*, 591 F.3d 724, 730 (4th Cir. 2010) ("While some courts have concluded that

15  Rule 15(a) does not apply to amendments seeking to add parties, . . . most courts,

16  including this one, have concluded otherwise.") (citations omitted); *Bibbs v. Early*,

17  541 F.3d 267, 275 n.39 (5th Cir. 2008) ("Rule 15 'takes precedence' over Rule 21

18  where a party falls within Rule 15 confines – for example, where the party 'attempts

19  to drop or add parties by an amended pleading filed before a responsive pleading is

20  served.'") (citation omitted); *United States ex rel. Precision Co. v. Koch Indus.,*

21  *Inc.*, 31 F.3d 1015, 1018-19 (10th Cir. 1994) ("Because the amendment was made

22  before defendants had filed a responsive pleading, plaintiffs were entitled to the

23  amendment [to add additional plaintiffs] as a matter of right."); *Wash. v. N.Y. City*

24  *Bd. of Estimate*, 709 F.2d 792, 795 (2d Cir. 1983) (holding that the plaintiff's

25  motion to amend should have been granted because he could have amended his

26  complaint to add defendants as a matter of right).

27       Because none of the authorities either side cites is controlling on this Court,

28  the Court must determine which outcome is more appropriate in this case.  The

Court finds the analysis and conclusions set forth in the opinions of the Second, Fourth, Fifth, and Tenth Circuits most persuasive.  The language of Rule 15 appears to establish an exception to the strict requirements of Rule 21.  Moreover, Defendants will not be prejudiced by their inclusion in this action at this stage of the proceedings given that the W.D.N.Y. action remains in its preliminary stages and that PAETEC can assert its claims against No Cost in this action as counterclaims. Finally, even if the Court were to find that Rule 15 does not control and leave of Court is required, the Court would find, given the early stage of the proceedings and the apparent relationship between the three Defendants, that No Cost should be given leave to join PAETEC and Wind. Corp. as a defendants pursuant to Rule 21.[4] Accordingly, the Court **DENIES** Defendants' respective motions to strike the First Amended Complaint.[5]

## C.   Defendants' Motions to Dismiss the First Amended Complaint

### 1.   Whether No Cost May Sue Wind. Corp., Wind. Inc., or Both

Wind. Inc. and Wind. Corp. argue that all claims against them in the First Amended Complaint should be dismissed because the Agreement was expressly between No Cost and PAETEC, it never names or mentions Wind. Inc. or Wind.

---

[4] Despite Defendants' assertion that No Cost's initial failure to name PAETEC and Wind. Corp. was blatantly strategic, Defendants do not explain what possible strategic advantage No Cost could have gained by not naming the original–and only–named party to the contract at issue.  On the contrary, No Cost explains that it believed PAETEC was no longer a legal entity once the company merged with Wind. Corp.  Indeed, Wind. Corp.'s own letter supports No Cost's belief that PAETEC was not the proper party to sue.  [*See* "Windstream" Nov. 22, 2011 Letter to No Cost, Ex. B to FAC, Doc. No. 15 at 19 (stating "Windstream Corporation has acquired PAETEC is [sic] moving their accounts payable functions to the corporate headquarters of its subsidiary, Windstream Communications, Inc.").]  Moreover, the sequence of pleadings further supports the innocent nature of No Cost's amendment.  Once PAETEC filed the W.D.N.Y. action and alleged in that complaint that PAETEC was in fact a viable legal entity, No Cost discovered this fact and quickly amended its Complaint in this District a short time later to reflect this newly-discovered fact.  Finally, while No Cost arguably should have named Wind. Corp. in its original Complaint out of an abundance of caution, the Court discerns no mischievous strategic motive in not doing so.

[5] The Court's conclusion here renders Wind. Inc.'s motion to dismiss the original Complaint moot, as a newly amended complaint supercedes the previously filed complaint and renders it "non-existent."  *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997), *overruled in part on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012).

Corp., and No Cost has not alleged facts sufficient to pursue either entity under an alter ego liability theory.  In opposition, No Cost argues it has alleged sufficient facts to pursue its contract-based claims against both entities under direct liability, alter ego, or successor liability theories.[6]  The Court first finds No Cost has failed to establish alter ego liability against either Wind. Inc. or Wind. Corp.  The Court next finds that No Cost has established potential successor liability against Wind. Corp., but has not done so against Wind. Inc.

### a. No Cost Has Not Sufficiently Alleged Alter Ego Liability Against Either Wind. Inc. or Wind. Corp.

"It is the general rule that a parent corporation and its subsidiary will be treated as separate legal entities." *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1192 (N.D. Cal. 2009) (citations omitted).  However, the alter ego doctrine is one exception to this general rule.  *Id.*  The Ninth Circuit applies the law of the forum state, which in this case is California.  *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (citations omitted).  In California, "[b]efore the doctrine [of alter ego liability] may be invoked, two elements must be alleged:  'First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.'"  *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003) (quoting *Sonora Diamond Corp. v. Sup. Ct.*, 99 Cal. Rptr. 2d 824, 836 (Cal. Ct. App. 2000)).  To pursue this theory of liability, a plaintiff must allege the elements of the doctrine; conclusory allegations are insufficient.  *Hokama v. E.F. Hutton & Co., Inc.*, 566 F. Supp. 636, 647 (C.D. Cal. 1983).

---

[6] No Cost argues that both entities are proper parties to this action based on its "direct" tortious interference and "fraud/negligent misrepresentation" claims against Wind. Inc. and Wind. Corp.  Because both entities also seek dismissal of these claims, the Court discusses these "direct"-liability claims separately below.

1    Here, an in-depth discussion of this theory is unnecessary because, as

2   Defendants note, No Cost only addresses the first element of the alter ego test.  No

3   Cost neither alleges in the First Amended Complaint, nor argues in its papers, that

4   fraud or injustice would result if Wind. Corp. or Wind. Inc. were not party to this

5   suit.  It appears No Cost seeks to bring Wind. Inc. and Wind. Corp. into this action

6   for purposes of being able to collect an eventual judgment, if any.  However, such

7   purpose is insufficient to establish the injustice or fraud element of the alter ego

8   test.  *See Nucal Foods, Inc. v. Quality Egg LLC*, 887 F. Supp. 2d 977, 992 (E.D.

9   Cal. 2012) (stating, with respect to the inequitable result element the alter ego test,

10   that a plaintiff "must be more than just a creditor attempting to recover on

11   unsatisfied debts; it must show that a defendant's conduct amounted to bad faith."

12   (citing *United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777-78

13   (9th Cir. 1977))); *see also Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal.

14   1995) ("[T]he plaintiff must make allegations of fact from which it appears that

15   recognition of the corporate entity would sanction a fraud or promote injustice.")

16   (citations omitted).  Consequently, because No Cost has not established both

17   elements of the alter ego test, the Court finds that No Cost cannot rely on this theory

18   to bring its contracts-based claims against Wind. Corp. and Wind. Inc.

19          **b.    No Cost May Bring Suit Against Wind. Corp., But Not Wind.
                    Inc., Under the Successor Liability Theory**
20

21          No Cost also argues that Wind. Inc. and Wind. Corp. are potentially liable

22   based on their status as PAETEC's successors-in-interest by operation of Wind.

23   Corp.'s acquisition of PAETEC.  The Court finds No Cost has established potential

24   successor liability based on Wind. Corp.'s acquisition by merger of PAETEC's

25   parent company, PAETEC Holding Corporation, and its named subsidiaries.

26   However, because PAETEC did not merge with Wind. Inc., successor-in-interest

27   liability does not supply No Cost a basis to bring its contract-based claims against

28   Wind. Inc.

Generally, "when a corporation purchases all or most of the assets of another corporation, the purchasing corporation does not assume the debts and liabilities of the selling corporation." *Me. State Retirement Sys. v. Countrywide Fin. Corp.*, No. 10-CV-302, 2011 WL 1765509, 2011 U.S. Dist. LEXIS 53359, at *17 (C.D. Cal. Apr. 20, 2011). There are, however exceptions to this general rule. *Id.* "Successor liability is governed by state law under the *Erie* doctrine." *Id.* at *10. Under California law, "a successor company has liability for a predecessor's actions if: (1) the successor expressly or impliedly agrees to assume the subject liabilities . . . [;] (2) the transaction amounts to a consolidation or merger of the successor and the predecessor[;] (3) the successor is a mere continuation of the predecessor[;] or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts." *CenterPoint Energy, Inc. v. Sup. Ct.*, 69 Cal. Rptr. 3d 202, 218 (Cal. Ct. App. 2007). Furthermore, "the liberal requirements of Rule 8(a)(2) apply to . . . successor-in-interest allegations . . . ." *Pac. Rollforming, LLC v. Trakloc Int'l, LLC*, No. 07-CV-1897, 2008 WL 4183916, 2008 U.S. Dist. LEXIS 69522, at *10 (S.D. Cal. Sept. 8, 2008).

Here, No Cost argues it has satisfied the first prong of the successor liability test. However, although No Cost alleges in paragraph 39 of its First Amended Complaint that, "as a result of the merger, the Windstream Defendants assumed all right and responsibilities with regard to the [contract with No Cost] as the successor in interest [to PAETEC]," such a conclusory allegation is insufficient, as No Cost must "plead the 'existence of a contract [and] its terms which establish the obligation [in] issue.'" *Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*, No. S-08-539, 2008 WL 2693741, 2008 U.S. Dist. LEXIS 111530, at *11 (E.D. Cal. July 1, 2008) (quoting *FPI Dev., Inc. v. Nakashima*, 383, 282 Cal. Rptr. 508, 517 (Cal. Ct. App. 1992)). Moreover, although No Cost references Wind. Corp.'s website, which states that "Windstream Corp. assumed PAETEC's net debt of approximately $1.4 billion," [FAC ¶ 42], this statement alone does not satisfy the

requirement that No Cost identify the terms of an assumption of liability or identify factual circumstances that give rise to such an assumption.[7]  *See Winner Chevrolet, Inc.*, 2008 U.S. Dist. LEXIS 111530 at *12-13 ("[P]laintiffs here must not only plead the existence of an assumption of liability but either the terms of that assumption of liability (if express) or the factual circumstances giving rise to an assumption of liability (if implied).").  Thus, No Cost cannot establish successor-in-interest liability under the "assumption of liabilities" prong of the success liability test.

However, No Cost satisfactorily alleges that Wind. Corp. and PAETEC consolidated or merged for purposes of the successor-in-interest test.  On December 1, 2011, Wind. Corp. announced:  "Today we officially combine with PAETEC and welcome thousands of great customers and associates into the fold."  Windstream PAETEC Merger, http://www.windstreambusiness.com/blog/2011/12/ paetec-windstream-merger; FAC ¶ 34.  After the merger, No Cost alleges Wind. Corp. "set about on a course of actions aimed at causing PAETEC's customers . . . to believe that PAETEC was now part of Windstream Communications."  [FAC ¶ 35.]  Wind. Corp. sent No Cost a letter stating that "PAETEC is now part of Windstream Communications."  [FAC ¶ 37.]  The invoices sent to No Cost confirmed that PAETEC was part of Wind. Corp.  Moreover, as part of the merger, "PAETEC shareholders received 0.460 shares of Windstream Corp. stock for each

---

[7]  Contrary to No Cost's allegations, it appears the $1.4 billion debt assumption actually does not include the contract between No Cost and PAETEC.  In so finding, the Court *sua sponte* takes judicial notice of Wind. Corp.'s November 30, 2011, Form 8-K Current Report filed with the United States Securities and Exchange Commission.  *See Collins v. Wells Fargo Bank*, No. CV-12-2284, 2013 WL 1092894, 2013 U.S. Dist. LEXIS 36196, at *17-19 (D. Ariz. Mar. 15, 2013) (discussing judicial notice and publicly-filed documents).  In this filing, Wind. Corp. reports that it agreed to guarantee three sets of PAETEC's Senior Notes issued in favor of The Bank of New York Mellon.  Windstream Corp., Current Report (Form 8-k) (Nov. 30, 2011), *available at* http://www.sec.gov/Archives/edgar/data/1282266/000119312511328344/d264652d8k.htm.  The combined value of these notes is $1.4 billion.  *Id.*  Thus, this filing strongly suggests that the "$1.4 billion" referenced in the news release No Cost quotes from Wind. Corp.'s website specifically refers to the three Senior Notes identified in the Form 8-K, not any other obligation.  Consequently, the statement on Wind. Corp.'s website is not persuasive evidence that Wind. Corp. assumed liability under the Agreement between No Cost and PAETEC.

PAETEC share owned at closing." [FAC ¶ 41.] Wind. Corp.'s Form 8-K also confirms the completed merger between PAETEC's parent company, PAETEC Holding Corp., and Wind. Corp.[8] These allegations satisfy the "consolidated or merger" method of alleging successor-in-interest liability against Wind. Corp. *Accord Monaco v. Bear Stearns Cos.*, No. CV-09-5438, 2011 WL 4059801, 2011 U.S. Dist. LEXIS 105471, at *60 (C.D. Cal. Sept. 12, 2011).

    The foregoing notwithstanding, insufficient basis exists to find that No Cost has stated a claim against Wind. Inc. such that Wind. Inc. is a proper party to this action based on the successor liability theory. Although No Cost alleges that PAETEC merged with Wind. Inc. and Wind. Corp., the November 30, 2011, SEC filing cited above makes clear that PAETEC merged with Wind. Corp. only:

> On November 30, 2011, Windstream Corporation ("Windstream") . . . completed its previously announced acquisition of PAETEC Holding Corp. . . . In the transaction, Peach Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of Windstream ("Merger Sub"), merged with and into PAETEC (the "Merger"), which continued as the surviving corporation of the Merger and as a wholly-owned subsidiary of Windstream [Corporation].

    Consequently, and for purposes of this Order only, the Court finds that potential successor liability exists as to Wind. Corp. only.

    Based on the foregoing, the Court **DENIES IN PART** Wind. Corp.'s motion to dismiss as to dismissal of No Cost's contract-based claims against Wind. Corp. Additionally, the Court **GRANTS IN PART** Wind. Inc.'s motion to dismiss as to No Cost's contract-based claims against Wind. Inc.

### 2.    PAETEC is a Proper Party to This Action

    Although PAETEC seemingly acknowledges that it could have been a proper party to this action had No Cost named it in the original Complaint, PAETEC avers

---

    [8] Wind. Corp.'s merger with PAETEC Holding Corp. included PAETEC. Windstream Corp., Exhibit 10.1 to Current Report (Form 8-K) (Aug. 8, 2012) at 94 ("Section 3.12") & Schedule 3.12 (listing PAETEC and PAETEC Holding Corp. as Wind. Corp.'s subsidiaries), *available at* http://www.sec.gov/Archives/edgar/data/1282266/000128226612000034/ex101amendmentagtcompiled.htm.

1  that No Cost "cannot bring PAETEC into its misguided complaint against" Wind.

2  Inc.  [PAETEC Oppo., Doc. No. 22-1 at 6.]  PAETEC asks the Court to dismiss the

3  First Amended Complaint against it on the basis that No Cost's original Complaint

4  named Wind. Inc. only and because PAETEC later filed its own action against No

5  Cost in New York federal court.  As the Court discussed above, No Cost's

6  amendment of the Complaint to join PAETEC was proper under Rule 15.

7  Moreover, PAETEC is a proper party in this case, as the company is potentially

8  directly liable to No Cost based on the written contract between PAETEC and No

9  Cost.  As for PAETEC's argument that the New York action "renders this case

10  moot," the Court disagrees as explained below.  Accordingly, the Court **DENIES**

11  the portion of PAETEC's motion to dismiss insofar as it seeks dismissal on the

12  bases that PAETEC is not a proper party and preemption of the instant action by the

13  New York action.

14        **3.  The "Fraud/Negligent Misrepresentation" Claim**

15        Defendants separately advance the same argument against No Cost's second

16  claim for "Fraud/Negligent Misrepresentation."  They aver this claim is barred as a

17  matter of law because "[c]ourts have long held that fraud with respect to a

18  misrepresentation is non-actionable if based on the terms of the contract."[9]  [Wind.

19  Inc. Motion, Doc. No. 21-1 at 21 (citing *Erlich v. Menezes*, 981 P.2d 978, 982-83

20  (Cal. 1999); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 460

21  (Cal. 1994)).]  Defendants next argue that No Cost has failed to satisfy Rule 9's

22  heightened pleading standard for fraud-based claims.  The Court concludes that No

23  Cost's claims are not barred as a matter of law.  However, the Court agrees that No

24

25        [9] Wind. Inc. and Wind. Corp. also argue that, to the extent the fraud claim is based on the

26  contract between No Cost and PAETEC, the claim cannot lie against Wind. Inc. and Wind. Corp. because they were not party to the contract.  However, as will become evident below, this

27  argument is a red herring.  Fraud-based claims in California cannot flow from breach of a contract and must arise from a breach of an independent duty based in tort, not contract.  Thus, whether

28  Wind. Inc. or Wind. Corp. were party to any contract is immaterial to whether they are liable in tort for fraud or negligent misrepresentation.

1  Cost has failed to meet Rule 9's particularity requirement.

2      In *Erlich*, the California Supreme Court generally discussed the differences

3  between tort and contract claims in the context of "whether a negligent breach of a

4  contract will support an award of damages for emotional distress – either as tort

5  damages or as consequential or special contract damages." *Erlich*, 981 P.2d at 891.

6  The lower appellate court had concluded that emotional distress damages were

7  properly awarded in a contract-based action because "the same wrongful conduct

8  may constitute a breach of contract and an invasion of an interest protected by the

9  laws of tort." *Id.* (citation and internal quotations omitted).  However, the

10  California Supreme Court clarified that "conduct amounting to a breach of contract

11  becomes tortious only when it also violates a duty independent of the contract

12  arising from principles of tort law." *Id.* at 983.  Thus, "[a]n omission to perform a

13  contract obligation is never a tort, unless that omission is also an omission of a legal

14  duty." *Id.* (citation and internal quotations omitted).  The Court further explained

15  that "[t]ort damages have been permitted in contract cases where a breach of duty

16  directly causes physical injury; for breach of the covenant of good faith and fair

17  dealing in insurance contracts; for wrongful discharge in violation of fundamental

18  public policy; or where the contract was fraudulently induced.  In each of these

19  cases, the duty that gives rise to tort liability is either completely independent of the

20  contract or arises from conduct which is both intentional and intended to harm." *Id.*

21  at 983 (citations omitted).  Because the jury in *Erlich* had concluded the defendant

22  had not acted intentionally nor was "guilty of fraud or misrepresentation," all that

23  remained was a "claim for negligent breach of a contract," which was "not sufficient

24  to support tortious damages for violation of an independent tort duty." *Id.* at 984.

25      Likewise, in *Applied Equipment Corp.*, the California Supreme Court laid out

26  the fundamental differences between contract and tort actions to answer the narrow

27  question whether "a contracting party can be held liable in tort for conspiracy to

28  interfere with its own contract." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,

869 P.2d 454, 455 (Cal. 1994). The Court answered this narrow question in the negative, and in doing so stated the general principles, which the court in *Erlich* later repeated, that "an omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." *Id.* at 460 (citation and quotations omitted).

Neither *Erlich* nor *Applied Equipment Corp.* stand for the rigid proposition that fraud and misrepresentation claims are *never* permissible when the gravamen of a lawsuit is breach of contract. Rather, as the California Supreme Court made clear, a plaintiff may assert a tort claim, in addition to contract claims, if he bases the tort claim on conduct independent of the mere act of breach of contract. *See also Lazar v. Sup. Ct.*, 909 P.2d 981, 985 (Cal. 1996) ("In [cases of promissory fraud], the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. 'If it is enforceable, the [plaintiff] . . . has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract.'") (citation omitted); *see generally McGuire v. Recontrust Co., N.A.*, No. S-11-2787, 2012 WL 4510675, 2012 U.S. Dist. LEXIS 141874, at *12-13 (E.D. Cal. Sept. 30, 2012) ("To the extent that plaintiff alleges misrepresentation, misrepresentation of fact meant to induce a party to contract is actionable fraud."). With the above principles in mind, the Court finds that No Cost's claim is not barred as a matter of law on the basis Defendants assert. No Cost alleges that PAETEC induced assent to contract by promising a more than 90% access charge collection rate when PAETEC knew that its actual collection rate was not so high. [FAC ¶¶ 28-29.] No Cost further alleges that the Windstream Defendants continued this alleged deception after the merger. [*Id.* ¶¶ 47-50, 56.]

The foregoing notwithstanding, Defendants are correct that No Cost has failed to meet the heightened pleading standard for fraud claims under Rule 9. *See generally Global Acquisitions Network v. Bank of Am. Corp.*, No. CV-12-8758, 2013 WL 604159, 2013 U.S. Dist. LEXIS 22351, at *21-23 (C.D. Cal. Feb. 19,

2013) (discussing Rule 9 in the context of fraud and negligent misrepresentation claims).  No Cost has not set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (internal quotation marks omitted).  Nor has No Cost sufficiently differentiated between PAETEC, Wind. Inc., and Wind. Corp.  *See generally Vega v. JP Morgan Chase Bank, N.A.*, 654 F. Supp. 2d 1104, 1115 (E.D. Cal. 2009) (discussing required pleading in cases involving multiple fraud defendants).  Finally, since this is an action against three corporations, No Cost has failed to sufficiently identify the "names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written."[10]  *Id.* (quoting *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. Rptr. 2d 861, 862-63 (Cal. Ct. App. 1991)) (quotations omitted).  Accordingly, the Court **GRANTS IN PART** Defendants' motions with respect to No Cost's second claim for "fraud/negligent misrepresentation" and **DISMISSES** this claim with leave to amend in accordance with the Court's discussion above.

### 4.    The Tortious Interference Claim

Wind. Inc. and Wind. Corp. challenge No Cost's tortious interference claim on four separate grounds:  (1) No Cost refers to Wind. Inc. and Wind. Corp. as "Windstream" and fails to differentiate the two companies; (2) No Cost does not allege that Wind. Inc. or Wind. Corp. "intended to cause harm and, engaged in conduct that was wrongful by some legal measure other than the fact of interference itself."; (3) if No Cost alleges that PAETEC and Wind. Inc. or Wind. Corp. are the same company, No Cost cannot state a claim against Wind. Inc. or Wind. Corp.

---

[10] Although No Cost does identify Jay Perreault, PAETEC's national account manager, as having assured No Cost of the 90% collection rate, [*see* FAC ¶ 28], this allegation does not cure the deficiencies in the fraud allegations.  For example, No Cost alleges that "PAETEC repeatedly represented to No Cost that it enjoyed high access charge collection rates," [*id.*], in the lead-up to the execution of the contract, but does not plead the particulars of any of these prior "repeated" representations.  Rule 9 requires more specificity.

because they cannot interfere with their own contract; and (4) No Cost is unable to demonstrate that Wind. Corp. is a "stranger-interloper" to the contract due to the parent-subsidiary relationship between Wind. Corp. and PAETEC.  The Court addresses each argument in turn.

First, Wind. Inc. and Wind. Corp. fault No Cost for failing to differentiate between the two companies and assert, without authority, that the tortious interference claim should be dismissed on this basis alone because neither company knows whether the claim is brought specifically against it.  However, this contention is unpersuasive because the first page of the First Amended Complaint makes clear that "Windstream" refers collectively to both Wind. Corp. and Wind. Inc.  Thus, when No Cost refers to "Windstream," both Wind. Corp. and Wind. Inc. are on notice that a claim or allegation is against them.  Moreover, in light of the fact that Wind. Corp. and Wind. Inc. apparently sometimes interchangeably referred to themselves as "Windstream," any confusion about which entity committed particular acts will ideally be clarified once discovery begins.  On balance, No Cost's allegations are sufficient for purposes of Rule 8.

Next, although Wind. Corp. and Wind. Inc. argue that No Cost fails to allege that they "intended to cause harm and, engaged in conduct that was wrongful by some legal measure other than the fact of interference itself," No Cost need not allege such facts in order to state a claim for tortious interference.  In order to state a claim for tortious interference, No Cost must allege "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Reeves v. Hanlon*, 95 P.3d 513, 517 (Cal. 2004).  Thus, as *Reeves* indicates, "intentional acts designed to induce a breach or disruption" and "actual breach or disruption" suffices to satisfy those elements of the tort.  No Cost is not required to allege conduct that was wrongful

1   "by some legal measure" beyond the fact of interference.  Accordingly, the tortious

2   interference claim is not subject to dismissal on this basis

3        Wind. Corp. and Wind. Inc. next argue that No Cost's claim is barred as a

4   matter of law because a party to a contract cannot interfere with its own contract

5   under California law.  Moreover, Wind. Corp.'s final argument–that Wind. Corp.

6   cannot be liable for tortious interference as PAETEC's parent company–is closely-

7   related to this argument.  No Cost invites the Court to "ignore" this argument

8   because its tortious interference claim is an alternative to its contract-based claims

9   and applies only if Wind. Inc. or Wind. Corp. did not gain all of the legal rights and

10  responsibilities under the Agreement.

11       As the court in *Applied Equipment Corp.* held, a party to an agreement cannot

12  interfere with its own contract.  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,

13  869 P.2d 454, 461-62 (Cal. 1994); *see also Mintz v. Blue Cross of Cal.*, 92 Cal.

14  Rptr. 3d 422, 429 (Cal. Ct. App. 2009); *PM Grp., Inc. v. Stewart*, 64 Cal. Rptr. 3d

15  227, 235 (Cal. Ct. App. 2007).  However, Rule 8(d)(3) allows a party to "state as

16  many separate claims or defenses as it has, regardless of consistency."  Cases in

17  which the principle in *Applied Equipment Corp.* barred tortious interference claims

18  as a matter of law include where a party was a direct signatory to the contract at

19  issue, *see, e.g.*, *Wynn v. NBC*, 234 F. Supp. 2d 1067, 1123 (C.D. Cal. 2002), or

20  involved dispositive motions, *see, e.g.*, *Fresno Motors, LLC v. Mercedes-Benz USA,*

21  *LLC*, 852 F. Supp. 2d 1280, 1293-1303 (E.D. Cal. 2012) (granting converted motion

22  for summary judgment); *ViChip Corp. v. Lee*, 438 F. Supp. 2d 1087, 1097-98 (N.D.

23  Cal. 2006) (granting motion for summary judgment); *Cavanaugh v. Unisource*

24  *Worldwide, Inc.*, No. CIV-F-06-119, 2007 WL 915223, 2007 U.S. Dist. LEXIS

25  25907, at *35-37 (E.D. Cal. Mar. 26, 2007) (same).

26       At the current stage of this case, No Cost may state a tortious interference

27  claim against Wind. Inc. and Wind. Corp. in the alternative to any contract-based

28  claim.  By arguing that this claim is an alternate claim that applies if Wind. Corp.

and Wind. Inc. did not gain all of the legal rights and responsibilities under the Agreement, No Cost implicitly acknowledges that a tortious interference claim cannot lie against a direct party to a contract or a party that has an interest in the contract.  However, whether Wind. Corp. or Wind. Inc. actually are interested parties to the PAETEC contract, or whether they are "strangers" or "interlopers," is an issue more properly addressed in later stages of this case and is better suited for adjudication on motion for summary judgment after the parties have the opportunity to conduct discovery.  *See generally PM Grp., Inc.*, 64 Cal. Rptr. 3d at 235 ("The tort of intentional interference with contractual relations is committed only by 'strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.'") (quoting *Applied Equip. Corp.*, 869 P.2d at 459); *United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*, No. 07-CV-2172, 2012 WL 3861695, 2012 U.S. Dist. LEXIS 126205 (S.D. Cal. Sept. 5, 2012) (providing in-depth analysis of California law with respect to "the degree of interest that a nonparty must have in a contract or business relationship to be a non-stranger.").

Based on the foregoing, the Court **DENIES** Wind. Corp.'s and Wind. Inc.'s motions to dismiss No Cost's tortious interference claim.

**D.    Defendants' Motions to Stay**

Finally, Defendants briefly ask the Court to enter a stay in this action "to allow the properly filed matter in the Western District of New York be adjudicated." They invoke the "first-filed" doctrine, stating that the New York action should proceed because the complaint in that case was filed before the First Amended Complaint in the instant matter.  No Cost counters that the First Amended Complaint in the instant action is the first-filed pleading because its filing relates back to the date of the filing of the Complaint under Rule 15(c).  While neither side provides the Court much guidance on this issue, the Court declines to apply the relation-back doctrine in conjunction with the first-filed rule and concludes that the instant action should proceed as the first-filed action.

12CV1699

1    **1.    Legal Principles**

2         **a.    The First-Filed Rule**

3         "The first-filed rule is a comity rule for resolving conflicts of jurisdiction

4    where parallel actions are filed in different federal district courts.  It provides that

5    where substantially identical actions are proceeding in different courts, the court of

6    the later-filed action should defer to the jurisdiction of the court of the first-filed

7    action by either dismissing, staying, or transferring the later-filed suit." *Saes*

8    *Getters S.P.A. v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1089 (S.D. Cal. 2002)

9    (citations omitted).  "While the determination of which case was first-filed is a

10   necessary starting point, other considerations come into play in determining which

11   of two parallel . . . actions must yield." *Id.*  For example, "courts will permit the

12   subsequently-filed action to proceed where the first one was an anticipatory suit or

13   where forum shopping was the only motive for filing the suit." *Id.*

14        The first filed doctrine is not "a rigid or inflexible rule to be mechanically

15   applied" and which mandates stay or dismissal.  *Pacesetter Sys., Inc. v. Medtronic,*

16   *Inc.*, 678 F.2d 93, 95 (9th Cir. 1982) (citing *Church of Scientology of Cal. v. U.S.*

17   *Dept. of Army*, 611 F.2d 738, 750 (9th Cir. 1979)).  Rather, the Court retains

18   "ample" discretion and may consider matters beyond the chronology of filings.  *Id.*;

19   *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 628 (9th Cir. 1991) ("The most

20   basic aspect of the first-to-file rule is that it is discretionary; an ample degree of

21   discretion, appropriate for disciplined and experienced judges, must be left to the

22   lower courts.") (citation and quotations omitted); *Barnes & Noble, Inc. v. LSI Corp.*,

23   823 F. Supp. 2d 980, 987 (N.D. Cal. 2011)  Thus, even if the first-filed rule applies,

24   the second-filed court "has discretion to transfer, stay, or dismiss the second case in

25   the interest of efficiency and judicial economy." *Cedars-Sinai Med. Ctr. v. Shalala*,

26   125 F.3d 765, 769 (9th Cir. 1991).

27

28

### b.   The Relation Back Doctrine

Federal Rule 15 provides that an amended complaint adding a new defendant will relate back to the original complaint if it "asserts a new claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading" and if, within 120 days of the initial complaint, the party to be added "received such notice of the action that it will not be prejudiced in defending on the merits" and "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).

### 2.   Discussion

The necessary starting point in the Court's analysis is the relationship between first-filed rule and the relation back doctrine.  Although the parties combine the two doctrines, they are actually distinct principles that serve different purposes and may not necessarily operate in tandem.  Indeed, courts are split on whether the relation-back doctrine applies in the context of the first-filed rule, and controlling, on-point caselaw does not exist in the Ninth Circuit.

A sister court recently provided a thorough analysis of the differing manner in which federal courts have applied the relation-back doctrine in the context of the first-filed rule.  *See Barnes & Noble, Inc. v. LSI Corp.*, 823 F. Supp. 2d 980, 986-95 (N.D. Cal. 2011).  In *LSI Corp.*, the district court first explained that "[a] number of courts have held that the filing of a complaint triggers the first-filed rule, regardless of whether the plaintiff later amends the complaint."  *Id.* at 987 (citing cases). However, the court acknowledged that although "[t]he relation back doctrine is designed for circumstances in which the timeliness of an amendment is at issue, for example, with respect to the statute of limitations," *id.* at 988-89, "[o]ther courts have applied the relation back doctrine to determine which case is filed first," *id.* at 987.  These latter courts find that "[a]n action is considered to have been the first filed, even if it was not chronologically first, if the claims relate back to an original

1   complaint that was chronologically filed first." *Id.* (citation and quotations

2   omitted).  Although the court thoroughly identified the split in authority above, the

3   court ultimately did not come down on either side of the debate, instead finding that

4   the amended complaint in that case would have related back even if the plaintiffs

5   were required to show relation back. *Id.* at 989 ("If Plaintiffs were required to show

6   relation back, Plaintiffs' FAC would relate back in the instant case.  As the Supreme

7   Court recently affirmed, the relation back doctrine under Rule 15(c) is appropriate

8   in a case of mistaken identity.").  The court in *LSI Corp.* aptly explained the

9   different purposes the two doctrines serve and cogently explained the split among

10  courts in applying them in tandem.

11          Given the differing manner in which courts have applied the first-filed rule

12  and relation-back doctrine, the Court must determine which approach is best suited

13  under the circumstances of this case.  Based on the circumstances of this case, the

14  Court declines to apply the relation-back doctrine in conjunction with the first-filed

15  rule.  Thus, once No Cost filed the original Complaint on July 9, 2012, this Court

16  became "the court which first acquired jurisdiction" and should therefore be the

17  court in which the parties' dispute is litigated.  *See Pacesetter Sys., Inc. v.*

18  *Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982).  Moreover, as in *LSI Corp.*, even if

19  No Cost is required to show that the First Amended Complaint relates back to the

20  filing of the Complaint, the Court would find that No Cost was reasonably mistaken

21  about the identity of the proper party to sue.  The exhibits attached to the First

22  Amended Complaint demonstrate that No Cost began communicating with

23  Windstream employees and began making payments to Wind. Inc., Wind. Corp., or

24  both.[11]

25          Finally, even if the Court were to find that the New York action was filed

26  

27      [11] No Cost was also justifiably confused about whether "Windstream" referred to Wind.
    Corp. or Wind. Inc.  Indeed, the Court shares this uncertainty.  The documents appended to the
    First Amended Complaint refer to "Windstream" only and do not specify which to which company

28  this name refers.

first, the Court would exercise its discretion and would not stay this matter under the circumstances of this case.  The Ninth Circuit has noted that justification exists for departing from the first-filed rule when a party files an anticipatory filing after the opposing party gives notice of its intent to sue.  *See Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 628 (9th Cir. 1991).  Here, while Defendants accuse No Cost of forum shopping, the sequence of events related to the filing of the action in New York and the mooted motion to dismiss in this District more convincingly suggest that Defendants, not No Cost, are shopping for a more convenient forum. Wind. Inc. filed its first motion to dismiss in this case just two days after PAETEC filed suit in New York, which suit then allowed Defendants to argue for a stay of the instant action to allow the New York suit to proceed.  Moreover, despite Defendants' bare assertion to the contrary, No Cost stood to gain no strategic advantage by not naming PAETEC in the original Complaint.  Based on the record before the Court, Defendants' assertions of forum shopping and strategic failure to name PAETEC and Wind. Corp. in the original Complaint are meritless. Defendants' respective motions to stay are **DENIED**.

**E.    Plaintiff's Motion to File Documents Under Seal**

Finally, No Cost moves the Court to file two exhibits to the First Amended Complaint under seal.  The first document is the contract at issue in this case, the Wholesale Master Services Agreement between PAETEC and No Cost.  The second document is a single-page email and accompanying attachment with commission calculations.  Defendants oppose the motion on the bases that they have not been served with copies of the proposed sealed documents and that No Cost has failed to explain the need for filing them under seal.

There is a presumptive right of public access to court records based upon the common law and the first amendment.  *See Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597 (1978); *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1212-13 (9th Cir. 2002).  Nonetheless, public access may be denied to protect

sensitive confidential information. Parties seeking to seal documents in a dispositive motion must meet the high threshold requiring "compelling reasons" with specific factual findings to support a sealing. *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178-80 (9th Cir. 2006) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136 (9th Cir. 2003)). However, for non-dispositive motions, the parties must show a lesser "particularized showing" under the "good cause" standard pursuant to Rule 26(c). *Id.* at 1180. The "compelling reasons" test requires showing more than just "good cause." *Id.*

With respect to the Agreement, No Cost's motion is moot, as Wind. Inc. has filed this document in its entirety as exhibits to two of its motions and requests for judicial notice. [Ex. A to Doc. No. 8; Ex. 1 to Doc. No. 8-5; Ex. A to Doc. No. 21-2; Ex. 1 to Doc. No. 21-4.] With respect to the email and commission payment attachment, No Cost has not made a showing that outweighs the public interest beyond stating that the document is covered by the confidentiality agreement in the Agreement and alleging that it "relat[es] to commission payments." This threadbare argument is insufficient. Accordingly, No Cost's motion is **DENIED**, and neither document may be filed under seal. However, No Cost may amend the First Amended Complaint in order to attach the unsealed exhibits if No Cost so chooses.

## IV.  CONCLUSION

Based on the foregoing discussion, the Court resolves the motions pending in this case as follows:

1. Doc. No. 8:  Defendant Windstream Communications, Inc.'s, motion to dismiss the original Complaint is **DENIED as moot**.

2. Doc. No. 13:  Plaintiff No Cost Conference, Inc.'s, motion to file documents under seal is **DENIED**;

3. Doc. No. 21:  Defendant Windstream Communication, Inc.'s, motion to dismiss the First Amended Complaint is **GRANTED IN PART** and **DENIED IN PART**. Accordingly, the following claims against Windstream

1    Communications, Inc., are **DISMISSED without prejudice** and with leave to

2    amend:

3          Count I:  Breach of contract

4          Count II:  Fraud/negligent misrepresentation;

5          Count III:  Accounting; and

6          Count V:  Declaratory judgment.

7  4.    Doc. No. 22:  Defendant PAETEC Communication, Inc.'s, motion to dismiss

8    the First Amended Complaint is **GRANTED IN PART** and **DENIED IN**

9    **PART**.  Accordingly, the following claim is **DISMISSED without prejudice**

10    and with leave to amend:

11          Count II:  Fraud/negligent misrepresentation;

12  5.    Doc. No. 27:  Defendant Windstream Corporation's motion to dismiss the

13    First Amended Complaint is **GRANTED IN PART** and **DENIED IN PART**.

14    Accordingly, the following claim is **DISMISSED without prejudice** and

15    with leave to amend:

16          Count II:  Fraud/negligent misrepresentation.

17  6.    Plaintiff is granted leave to amend the First Amended Complaint in

18    accordance with this Order.  A Second Amended Complaint shall be filed no

19    later than 14 calendar days from the date of this Order.

20  **IT IS SO ORDERED.**

21

22  **DATED:  April 16, 2013**

23

24          **HON. GONZALO P. CURIEL**
             **United States District Judge**

25

26

27

28